**AFFIRMED as MODIFIED and Opinion Filed March 1, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-01438-CR**
**No. 05-19-01439-CR**
**No. 05-19-01440-CR**

**ALEX CARCAMO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F18-33424-V, F18-33521-V, F18-33524-V**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Carlyle
Opinion by Justice Osborne

A jury convicted Alex Carcamo of murder (trial court Cause No. F18-33424-V) and two aggravated assaults with deadly weapon (trial court Cause Nos. F18-33521-V and F18-33524-V). The trial court sentenced him to 40 years' imprisonment for murder and 10 years' imprisonment for each aggravated assault with deadly weapon, with the sentences to run concurrently. Appellant raises two issues on appeal, asserting that the trial court abused its discretion by admitting evidence of certain pretrial and in-court identifications by two witnesses. Appellant

also requests modification of the judgment in Cause No. F18-33424-V to correctly reflect the name of the trial judge.

We modify the judgment in Cause No. F18-33424-V to correctly reflect the trial judge's name. We also modify the judgments in each cause number to reflect that punishment was assessed by the trial judge, not the jury. As modified, we affirm.

## BACKGROUND

On the evening of March 16, 2018, Alex Sosa-Torres, Christian Martinez, and Wilson Flores shared a ride home from work. After their ride dropped them off, the three sat and talked outside their apartment building. Martinez noticed a green truck drive by. Neither the truck's driver—Appellant—nor its passenger, Appellant's cousin Lisandro Beltran, were known to Sosa-Torres, Martinez, or Flores.

According to Beltran's testimony at trial, as the truck drove past, the three men "were giving us this look, like this mean look . . . they were mugging us." He continued, "And when we had passed by, well, we was staring at them, too, like we was mugging back." Beltran testified that he got mad, and "that's when [Appellant] put the, put the truck in reverse, and . . . that's when we started arguing with them." He explained:

Q. What were you saying?

A. I was like, if y'all want to fight, we can fight. Just we was mad.

Q. You were mad over a look?

A. Well, it was more like basically a mean mug since they were mean mugging us.

Beltran and Appellant "started talking trash" with the men. Froylan Hernandez, who lived on the second floor of the apartment building where the events occurred, heard the argument and looked out his window to see what was happening. He saw people arguing by a green truck.

Next, Appellant got out of the truck and pointed a gun at the three men. Martinez testified that the gun was a silver and black 9-millimeter. Martinez told Appellant and Beltran to calm down, saying that he did not want any problem. Hernandez also heard some of the argument, and testified that "the man that died [Sosa-Torres], he said, 'If I could, I could take that thing from you.' Something like that." Although Hernandez "did not see exactly what [Sosa-Torres] was referring to," the man to whom Sosa-Torres was speaking "was putting his hand where his pocket is." Hernandez could not see if the man was pulling out a weapon. The man went back into his truck, however, and then Hernandez "heard the, the shooting."

Martinez testified that Appellant got back in the truck and started shooting at him, Sosa-Torres, and Flores between the seats and through a back window. Beltran also testified that Appellant started shooting from the back window. Beltran continued:

Q.   Did any of these three men have weapons on them?

A.   No ma'am.

Q.   So nobody pulled a weapon out. Your cousin [Appellant] just started shooting on his own.

A.    Well, not instantly. He had the gun. Like, he pulled it out. He cocked it. And I was telling him no. I was like, no, you don't need to do this. I kept on telling him, like, we just fight, we can fight.

And he was like, no, if I have a gun, why not use it? You know. He was basically saying, well, I'll do what I have to do.

Flores testified to a similar description of events. He explained that the passenger in the truck got out and "wanted to fight [but] none of us wanted to. So he got back on [the truck] and he was arguing there . . . ." Then the driver "opened the door and got down but then he went back on," and "[t]hat's when [Appellant] pulled out the weapon and he, and he shot" at Sosa-Torres and Martinez. Flores first "went down on the ground" and then "jumped down into the ditch" next to the road to avoid the gunshots.

Sosa-Torres and Martinez also started running toward the ditch. The truck then backed up and left the scene. As soon as Flores saw that Sosa-Torres and Martinez had been shot, he ran into the apartment building to find Sosa-Torres's wife, and later spoke to police when they arrived at the scene.

Sosa-Torres was shot in the chest and died as a result of the injury. Martinez was shot in the hand as he ran. Flores escaped with no injury from the shooting.

Hernandez observed the group for "about a minute and a half, I think." Hernandez called 911, reported that someone had been shot after a fight, and requested an ambulance. A recording of the call was played for the jury. Hernandez

–4–

reported that the shooter left the scene in a Ford Expedition. Hernandez then went down to try to help the men who had been shot.

Beltran testified that he and Appellant drove to Appellant's home. Appellant was not excited or upset; he was acting "[j]ust like a normal day." Appellant asked his brother to move a car in the driveway so that Appellant could park the truck "to the side" in an effort to hide it.

Beltran testified that Appellant later texted him to ask what happened to the three men:

Q. How did you reply to your cousin?

A. To what text message?

Q. When he's asking you if they're alive.

A. I had, I had told him one died and the other two were alive.

Q. But you added some context, right?

A. I had added, I said, "They're still alive, wagging—"

Q. Wagging their little tails?

A. "—their little tails," yes, ma'am.

Q. What did the defendant reply?

A. He said, "Dammit."

Q. "Dammit, boy."

A. Yeah, "Dammit, boy."

Officer Philip Howard of the Irving Police Department investigated the shooting. Howard found a traffic citation in the Irving police records database that

–5–

matched witnesses' description of the shooter and the truck. He then traced the registered owner of the vehicle, Appellant's mother, to her address and found a green Ford Expedition parked there. With consent from Appellant's mother to search the truck, officers recovered a gun case, an unfired bullet, fired cartridges, and Beltran's cell phone. Officers then obtained a search warrant to test the vehicle for gunshot residue. These tests indicated gunshot residue around the truck's rear passenger seat and door.

After executing a search warrant for Appellant's home, officers recovered a 9mm gun with live rounds in Appellant's room. A firearms examiner determined the bullet recovered from the murder victim was fired from the 9mm pistol found in Appellant's room. Further, through a cell phone mapping process, the police were able to determine the proximity of Appellant's and Beltran's cell phones to the shooting location at the time the shooting occurred.

Flores was shown a photo lineup by police. He identified Appellant as one of the suspects in the murder and assaults. Flores was also shown a second photo lineup on the same day that did not include Appellant's photo. At the time, police had identified a second suspect who was later determined to have had no involvement in the case. In the photo lineup, Flores identified this second suspect who was later cleared. Martinez was shown two photo lineups but did not identify Appellant.

Hernandez, the witness who called 911, testified that he was not interviewed by the police after the shooting, but was contacted by the district attorney's office a

week or two before trial.[1] He was never shown a photo lineup. When he met with prosecutors, they showed him a photograph of Appellant. He told them that Appellant "looks familiar," but he could not say for sure that Appellant was the person he saw shoot Sosa-Torres. Over Appellant's objection that the trial court heard and overruled outside the jury's presence, Hernandez testified before the jury that Appellant "seems familiar" as the person who got back in the truck during the argument before the shooting.

The jury found Appellant guilty of Sosa-Torres's murder and the aggravated assaults of Martinez and Flores with a deadly weapon. During the punishment phase of the trial, the trial court heard testimony from ten additional witnesses before making affirmative deadly-weapon findings in the assault cases and sentencing Appellant in each of the three cases. Explaining the sentences, the trial court stated:

> The Court has taken into account the defendant's relatively tender years and relative lack of criminal history; however, the Court carefully observed the chilling heinousness of the defendant's act and his subsequent behavior clearly showing that he wished that all three of his victims were dead.

The trial court rendered judgment in each of the three cases reflecting the jury's verdicts of guilty and the sentences pronounced in open court. This appeal followed. Appellant does not challenge the sufficiency of the evidence to support the convictions. Instead, he argues he was denied due process when the trial court

---

[1] The first phase of the trial took place in October 2019, approximately eighteen months after the shooting.

overruled his objections and admitted Flores's and Hernandez's testimony identifying him at trial.

APPLICABLE LAW AND STANDARD OF REVIEW

## A. Pretrial identification in photo lineup

In his first issue, Appellant argues the trial court abused its discretion by admitting evidence of Flores's pretrial identification because the photo lineup shown to Flores was "impermissibly suggestive and tainted by an improper procedure." Appellant argues the tainted lineup resulted in "substantial likelihood of irreparable misidentification causing harm to Appellant and denying him due process."

"The Due Process Clause bars the admission of identification evidence only when the introduction of such evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Balderas v. State*, 517 S.W.3d 756, 791 (Tex. Crim. App. 2016) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012)). The court in *Balderas* explained, "Generally, the Constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting its introduction, but by affording the defendant the means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.*

The defendant bears the burden to establish by clear and convincing evidence that the pretrial procedure was impermissibly suggestive. *Id.* at 792. "[A]n unnecessarily suggestive pretrial identification procedure does not, in itself, intrude upon a constitutionally protected interest." *Id.* If the court determines that a pretrial

–8–

identification procedure was impermissibly suggestive, it then assesses the reliability of the identification under the totality of the circumstances. *Id.* The court assesses reliability by weighing five non-exclusive factors against the corrupting effect of any suggestive identification procedure:

> (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.*

"On appeal, in reviewing the trial judge's assessment of reliability, we consider these factors, which are issues of historical fact, deferentially in a light favorable to the trial court's ruling." *Id.* We then weigh them de novo against any "corrupting effect" of the suggestive pretrial identification procedure. *Id.* We review the evidence adduced at the admissibility hearing as well as the evidence adduced at trial. *Id.*

## B. In-court identification

In his second issue, Appellant argues that the trial court abused its discretion by admitting evidence of Hernandez's in-court identification. He argues that the identification "was tainted by showing the witness a photo of Appellant prior to his testifying rendering his identification impermissibly suggestive." He also argues that the trial court erred by denying his request for an in-court identification hearing with

the jury absent.[2] He concludes that these errors resulted in a "substantial likelihood of irreparable misidentification" causing him irreparable harm and denying him due process.

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial identification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). "The test is whether, considering the totality of the circumstances, 'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. U.S.*, 390 U.S. 377, 384 (1968)). In *Ibarra*, the court explained that reliability is "the critical question" and the "linchpin in determining the admissibility of identification testimony." *Id.* (quoting *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988). "'If the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed reliable.'" *Id.* (quoting *Webb*, 760 S.W.2d at 269).

---

[2] The trial court did hold a hearing out of the jury's presence regarding the admissibility of Hernandez's identification. Appellant's complaint here appears to be that at the hearing, he was sitting at counsel table and was Hernandez's only available choice. This and other courts have rejected similar complaints. *See, e.g., Harrison v. State*, No. 14-10-00254-CR, 2011 WL 5589532, at *8 (Tex. App.—Houston [14th Dist.] Nov. 17, 2011, no pet.) (mem. op., not designated for publication) (no Texas precedent "holding that the presence of defendant at defense counsel's table when a witness is making an in-court identification is an impermissibly suggestive procedure which may lead to a very substantial likelihood of irreparable misidentification") (collecting cases); *Senior v. State*, No. 05-04-00297-CR, 2005 WL 478723, at *2 (Tex. App.—Dallas Mar. 2, 2005, no pet.) (mem. op., not designated for publication) ("there is no law which prohibits a court from requiring a defendant to sit at counsel table with his attorney during trial"). As we discuss below, however, our focus here is Hernandez's pretrial view of a single photograph before identifying Appellant in court, not the lack of a pretrial hearing.

In determining reliability, courts consider the same five non-exclusive factors discussed in *Balderas* and set forth above. *See Balderas*, 517 S.W.3d at 792; *Ibarra*, 11 S.W.3d at 195. We consider the factors deferentially in a light favorable to the trial court's ruling. *Ibarra*, 11 S.W.3d at 195. The factors are then weighed de novo against "the corrupting effect" of the suggestive pretrial identification procedure. *Id.* The question is whether the procedures were so suggestive as to present a very substantial likelihood for irreparable misidentification so as to deny Appellant due process. *Id.* at 196.

**DISCUSSION**

**A. Identification by witness Flores in photo lineup**

The trial court conducted a hearing out of the jury's presence on Appellant's objections that Flores's identification was "the product of a faulty lineup procedure" because the translator "was aware of who the two suspects were" and because the lineups were "unduly suggestive or prejudicial."[3] On appeal, Appellant adds the complaint that he "stands out from the other 5 pictures" in the photo lineup "by the overgrown beard, whereas all the other 5 are clean shaven." He argues that the "significant beard" in his photo "ma[de] him stand out from the others and influenc[ed] the victim's choice."

---

[3] Appellant also argued that in one of the two lineups shown to Flores, Flores made a mistake, picking out a person who the police then believed had been a passenger in the truck, but "who in fact later was cleared of any involvement in the case." The trial court ruled that this error "is certainly grist for the jury, fodder for cross-examination," but not grounds for excluding the evidence.

–11–

Two police officers testified at the hearing. First, Officer Kevin McCown testified that he acted as a "blind administrator" in the photo lineups shown to Flores on March 20, 2018, explaining that "a blind administrator is somebody who has no knowledge of the suspect, doesn't know who the suspect is." McCown testified that he showed the lineups to Flores, who spoke only Spanish. Consequently, Detective Olegario Conde acted as a translator. McCown testified that Flores identified Appellant "as one of the suspects in the murder and assault." On cross-examination, McCown confirmed that he was not "otherwise involved with the investigation of the case" and, at the time he presented the lineups, "had no idea who the suspects were." Further, McCown testified he did not know "prior to this moment" that one of the suspects Flores identified "was later cleared of any involvement" in the case. On redirect examination, McCown further explained the procedure he used in the lineups:

> So first we have an admonition form which explains the process. That is read to them. Detective Conde interpreted it for the witness. Once I made sure that that was understood, what I do is I show each photograph one at a time. I ask that they don't make any identifications the first time around. I want them to see all six photographs one at a time. And then on the second time, I ask, ask them to let me know if they identify anybody.

McCown then confirmed that in one of the lineups, Flores identified the driver of the truck.

Conde also testified at the hearing outside the jury's presence. He is bilingual in Spanish and English and was asked to translate during the lineup for Flores, who

speaks only Spanish. He testified that he knew "who the suspects were" because he assisted on traffic stops of a Ford Expedition and a tan Trailblazer, but described his knowledge about the case as "just an overview," explaining that "I wasn't involved directly in the case at all other than to conduct surveillance on some vehicles." He discussed State's Exhibits 10 and 12, the video and photo lineup where he acted as translator. He testified that he read the admonishment form to Flores "word-for-word as stated on the form," and gave the following instructions:

> I told victim [Flores] that I would show him a six-picture photo lineup one at a time and this lineup will be shown to him twice. The first time around I asked him not to say anything, don't make any comments. And after the first time, when we did it again, I asked him, if you recognize anybody let us know.

Conde testified that Flores did recognize someone on State's Exhibit 12. Conde "wasn't 100 percent sure" the photo that Flores chose was "one of the suspects." He then explained the steps he took to make sure he did not unduly influence Flores's choice: "I didn't make any gestures, nods, point, or anything at all. I strictly read the admonishment form. And if I remember correctly, it was actually Detective McCown who was actually flipping pages." He did not touch the lineup, turn the pages, or "add any extra verbiage to whatever McCown was telling [Flores] to do." Instead, he "strictly interpreted in Spanish."

The trial court concluded "that the pretrial identification procedure was not impermissibly suggestive," and overruled Appellant's objections, permitting the jury to hear testimony about Flores's identification. Appellant now argues this ruling

was error because he was the only suspect in the lineup with a "significant beard" and because Conde knew he was the suspect. Appellant concedes that other reliability factors favor the admission of Flores's identification, noting that:

(1)     Flores was present when Appellant's truck drove by and he saw Appellant and Beltran exit the vehicle and get back in;

(2)     Flores had a high degree of attention when he stood up as they argued with Appellant and Beltran;

(3)     The prior description of the shooter was a light skinned Hispanic male with short hair in his early twenties;

(4)     It appears this initial general description from the time of the confrontation was fairly certain; and

(5)     The identification was made through the line-up on March 20, 2018, four days after the confrontation.

Appellant argues, however, that Conde's knowledge and Appellant's "significant beard" "contribute to the corrupting effect resulting in a substantial likelihood of misidentification," and that "this error was a contributing factor in the jury's deliberations in arriving at its verdict."

The photo lineup, State's Exhibit 12, is included in our record.[4] It reveals six photographs of Hispanic men, none of whom has a beard. Appellant's photo shows at most a shadow on his chin, as do four of the other five photos. Thus, contrary to Appellant's contention, this feature did not render the lineup unduly suggestive. Further, all of the photographs show men similar in age, race, features, and hair

---

[4] Prior to submission of this appeal, we granted the State's motion to supplement the Reporter's Record with color photographs of the lineup.

length, all identically dressed. The photos are the same size, have the same camera angle, and appear to have been taken from the same distance under similar lighting. Having reviewed the photographs, we conclude there is nothing distinctive about Appellant's photo in the lineup as compared to the others, nor did any facial hair cause Appellant's photo to stand out from the others in any significant way. We conclude the photographic array was not impermissibly suggestive.

Further, Appellant has cited no evidence to support his allegation that Conde's role as a translator influenced Flores's identification. McCown, who handled the photographs and administered the lineup, knew nothing about the case. Although there was a video taken of the lineup and made a part of the record, Appellant does not direct our attention to anything Conde said or did to support the allegation that Conde somehow influenced Flores's choice. Conde's testimony was to the contrary, and provided evidence to support the trial court's ruling.

Because Appellant has not established by clear and convincing evidence that the pretrial procedure was impermissibly suggestive, we do not consider the second step of the analysis. *See Webb*, 760 S.W.2d at 269 (court's conclusion that the challenged pretrial identification procedure was not impermissibly suggestive obviates the need to consider whether it creates substantial likelihood of misidentification); *Balderas*, 517 S.W.3d at 792 (defendant bears burden to establish by clear and convincing evidence that the pretrial procedure was impermissibly suggestive). We decide Appellant's first issue against him.

## B. Identification by witness Hernandez in open court

The record reflects that police showed Hernandez a photograph of Appellant prior to trial. The trial court permitted Hernandez to identify Appellant in a hearing out of the jury's presence when Appellant was sitting at counsel table. At the hearing, the trial court overruled Appellant's objections that "this witness[ ] is only identifying the defendant through a process by which the defendant is the only person being presented to him" and "there was never any even purported identification, independent or unbiased[,] or [any] process, that did not suggest the result."

As detailed above, Hernandez testified before the jury that he saw a man arguing with Sosa-Torres who was "putting his hand where his pocket is" and then saw the man get back in the truck immediately before the shooting started. When asked if he saw the man "in the courtroom today," and could "point him out by an article of clothing he's wearing," Hernandez responded, "This young man seems familiar. Yes, he's wearing a blue shirt."

In *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993), *overruled on other grounds by Ex parte Moreno*, 245 S.W.3d 419, 425 n.18 (Tex. Crim. App. 2008), the court concluded that showing a witness a single photograph of the defendant "was impermissibly suggestive," noting that "[i]t is possible that this procedure suggested to [the witness] that the Sheriff believed appellant was the person who killed her husband." *Id.* The court continued, "However, this does not

end our inquiry in determining the reliability of the in-court identification." *Id.* The

court proceeded to address the five reliability factors discussed above and concluded

that the witness's testimony "was reliable despite the unnecessarily suggestive

pretrial occurrence." *See id.* at 706–08. Appellant argues that although the five

reliability factors "slightly favor" admission of Hernandez's identification, the

identification was "highly tainted" by showing Appellant's picture to Hernandez

before trial. We consider the factors:

(1) *The witness's opportunity to view the suspect at the time of the crime:* Hernandez had the opportunity to view Appellant at the time of the crime, watching the argument from his second-floor apartment, and he was able to hear the argument taking place. He could see a man reach toward his pocket then return to the driver's side of the truck immediately before the shooting began.

(2) *The witness's degree of attention:* Although he was not personally involved, Hernandez was paying attention to the argument, was able to recount the substance of the argument and the sequence of events, identified the color and model of the vehicle, called 911 when the shooting began, and then went downstairs and into the ditch where Sosa-Torres fell to try to help. The shooting took place in front of Hernandez's home, and he provided consistent, detailed testimony of what he saw and heard.

(3) *The accuracy of the witness's prior description of the criminal:* Hernandez told the 911 operator that the shooter was an Hispanic male and described the shooter's clothing, but was not asked for further detail in that call and was not interviewed by police at the scene.

(4) *The level of certainty demonstrated by the witness at the confrontation:* Hernandez's identification, both in the hearing outside the jury's presence and before the jury, was not definitive. At the initial hearing he said the person he saw at the time of the crime "looks like the, the young guy in the blue, but I'm not certain," and before the jury, testified that Appellant "seems familiar."

–17–

(5) *The length of time between the crime and the confrontation:* Hernandez was not shown the photo of Appellant until a few weeks before trial, more than a year after the murder. Hernandez, however, was able to give a detailed account of the events during his testimony.

*See Balderas*, 517 S.W.3d at 792. Although Hernandez's level of certainty and nonspecific description weigh against the reliability of his identification, the other factors support a conclusion that Hernandez's identification in court was based solely on what he observed at the scene, not on the photo he was shown prior to trial. *See Barley v. State*, 906 S.W.2d 27, 35 (Tex. Crim. App. 1995) (identifications based solely on witnesses' observations at the scene were reliable and admissible). Consequently, we conclude that no substantial likelihood of irreparable misidentification was created so as to deny Appellant due process. *See id.* at 34–35.

Even if these factors did not weigh in favor of admission, however, we would conclude that the other evidence in the record renders the asserted error harmless. *See* Tex. R. App. P. 44.2(a).[5] A constitutional error may be held harmless if there is overwhelming untainted evidence to support the conviction. *See Tijerina v. State*, 334 S.W.3d 825, 835 (Tex. App.—Amarillo 2011, pet. ref'd) (citing *Harrington v. California*, 395 U.S. 250, 254 (1969)). We do not focus on the propriety of the trial's outcome, but calculate, to the degree possible, the probable impact of the error on

---

[5] Appellate procedure rule 44.2(a) provides, "*Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

the conviction in light of the existence of other evidence. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

Here, overwhelming untainted evidence supports the jury's verdict. Among other evidence, the record shows that:

- Hernandez was not the only witness to identify Appellant. Most notably, Beltran testified[6] that Appellant drove the truck, argued with the three men, fired the gun out the back window of the car, drove away, and attempted to hide the truck from street view.

- The State offered evidence that Appellant purchased the Smith & Wesson handgun that was recovered from a locked safe in Appellant's bedroom.

- Ballistics analysis determined that Appellant's handgun fired the bullets recovered from Sosa-Torres's body and from Appellant's mother's Ford Expedition that Appellant was driving at the time of the murder.

- The State offered expert testimony about the location of gunshot residue found in the Expedition, supporting the testimony of Beltran and Martinez that the shooting came from the back-passenger window.

- Appellant's cellphone was in the area of the shooting when it occurred.

- In sentencing Appellant, the trial court expressly relied on evidence of Appellant's "subsequent behavior clearly showing that he wished that all three of his victims were dead," not on Hernandez's identification.

---

[6] The trial court granted Appellant's request to instruct the jury that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant to the offense. *See* TEX. CODE CRIM. PROC. art. 38.14 (Testimony of accomplice). This rule requires only "that there be other evidence tending to connect the defendant with the offense"; it is not derived from constitutional principles defining sufficiency. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). Here, as we discuss, there was sufficient other evidence tending to connect Appellant to the offense, and in any event, Appellant does not challenge the sufficiency of the evidence to support his conviction. Consequently, we consider Beltran's corroborated testimony with the other evidence unrelated to Hernandez's identification. *See, e.g., Balderas*, 517 S.W.3d at 766 (appellate court considers all of the evidence in determining sufficiency, whether properly or improperly admitted).

We conclude that any error in admitting Hernandez's identification of Appellant did not contribute to Appellant's conviction or punishment. *See* TEX. R. APP. P. 44.2(a). We decide Appellant's second issue against him.

## C. Modification of Judgment

Appellant also requests that we modify the judgment in Cause No. F18-33424-V to correctly reflect the name of the trial judge, Michael Snipes. The State concurs. We also note that the judgment in each cause incorrectly reflects that punishment was assessed by the jury.

We have the authority to modify an incorrect judgment where the necessary data and information are available. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (appellate courts have power to reform judgments); *Estrada v. State*, 334 S.W.3d 57, 63 (Tex. App.—Dallas 2009, no pet.) ("This Court has the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so.").

Accordingly, we modify the judgment in Cause No. F18-33424-V to reflect that the trial judge's name is Michael Snipes, and we modify the judgments in each cause number to reflect that punishment in each case was assessed by the trial judge.

### CONCLUSION

We modify the trial court's judgment in Cause No. F18-33424-V to reflect the name of the presiding trial judge as "Michael Snipes," and to reflect that punishment was assessed by the trial judge. We modify the trial court's judgments in Cause No.

F18-33521-V and Cause No. F18-33524-V to reflect that punishment in each case was assessed by the trial judge. As modified, we affirm the trial court's judgments.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

191438F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALEX CARCAMO, Appellant

No. 05-19-01438-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F18-33424-V.
Opinion delivered by Justice Osborne. Justices Myers and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect (1) the name of the trial judge as "Michael Snipes," and (2) that punishment was assessed by the trial judge, not the jury.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 1, 2021



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

ALEX CARCAMO, Appellant

No. 05-19-01439-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas Trial Court Cause No. F18-33521-V. Opinion delivered by Justice Osborne. Justices Myers and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect that punishment was assessed by the trial judge.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 1, 2021



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALEX CARCAMO, Appellant

No. 05-19-01440-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas Trial Court Cause No. F18-33524-V. Opinion delivered by Justice Osborne. Justices Myers and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect that punishment was assessed by the trial judge.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 1, 2021